FILED _____ RECEIVED
_____ ENTERED _____ SERVED ON
COUNSEL/PARTIES OF RECORD

DEC 27 2010

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ALAN PULSIPHER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | 2:08-cv-01374-RCJ-LRL |
| vs. ) | |
| ) | |
| CLARK COUNTY et al., ) | ORDER |
| ) | |
| Defendants. ) | |

This case arises out of alleged race-, religion-, and gender-based employment discrimination. The Court has denied Defendants' motion for summary judgment. Before the Court are Defendants' Motion to Reconsider (ECF No.79) and Defendants' Motion in Limine (ECF No. 84). For the reasons given herein, the Court denies the motion for reconsideration and grants the motion in limine in part and denies it in part.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiff Alan Pulsipher is a white, male member of the Church of Jesus Christ of Latter-day Saints, commonly known as the "Mormon Church." (Am. Compl. ¶ 13). He has been employed by Clark County, Nevada in the Division of Juvenile Justice Services ("DJJS") for over a decade and is currently classified as Management Analyst II C-29. (*Id.* ¶¶ 12, 15).

In the late 1990s, Clark County established the DJJS Probation Officer Academy (the "Academy") within DJJS because state law required all juvenile probation officers to attend a basic law enforcement academy, and sending the County's probation officers to the police academy in Carson City would have been prohibitively expensive. (*Id.* ¶¶ 16–18). The first cadet

cycle at the academy began in the Spring of 1999. (*Id.* ¶ 19). Plaintiff served as the Executive Officer for the first four cycles, after which he was assigned as Commander, beginning with the Spring 2001 cycle. (*Id.* ¶¶ 19–20). Plaintiff served as Commander through June 2006, administering a total of twelve regular and special cadet cycles. (*Id.* ¶¶ 22–24).

On or about April 26, 2006, DJJS reorganized, resulting in the creation of the Professional Development Unit ("PDU"). (*Id.* ¶ 29). Defendant Larry Carter was assigned as the Assistant Director in charge of the PDU, which originally consisted only of Defendant Sheron Hayes and Plaintiff. (*Id.* ¶ 30). Hayes reported to Defendant Cherie Townsend during this time period. (*Id.* ¶ 31). In the present motion, Defendants claim that Hayes in fact reported to Carter at the PDU, not Townsend. Soon thereafter, Hayes was classified as a Principal Management Analyst C-31 and was made Plaintiff's direct supervisor. (*Id.* ¶ 32). In the present motion, Defendants contend that Hayes had been a Principal Management Analyst since 2002 but was first appointed as Plaintiff's supervisor in 2006.

Plaintiff alleges that Hayes began to treat him differently from other DJJS employees who were not members of the relevant protected classes. Specifically, he alleges: (1) on or about November 17, 2006, Hayes entered a class Plaintiff was teaching without prior notice and solicited confidential evaluations of Plaintiff; (2) Hayes began giving Plaintiff little or no notice of staff meetings, although other employees received notice; (3) Hayes routinely scheduled meetings based on other employees' availability and then mandated Plaintiff's attendance without ever having inquired as to his availability; (4) on January 18, 2007, Hayes and Brenda Martinez, a DJJS employee in the PDU, confiscated four Academy logbooks from Plaintiff's office while he was on vacation that were not needed for work purposes but which contained documentation of Hayes's harassment of Plaintiff; (5) Hayes directed Martinez to keep these logbooks, which were critical to Plaintiff's performance, at a location away from the Academy, making performance of his duties more difficult; (6) on June 8, 2007, Hayes denied Plaintiff

permission to attend the funeral of a co-worker without applying for leave, while permitting others (including herself) to attend without taking leave; (7) on or about June 26, 2007, Hayes began demanding advance notice from Plaintiff any time he would leave the campus, while not requiring the same of other employees; (8) during the Fall 2006 Academy, Hayes maintained contact with one or more of Plaintiff's problem students, encouraging misconduct in his classes in an attempt to bait him into a work violation; (9) Hayes made derogatory statements about Plaintiff's race and religion; and (10) Hayes frequently denied Plaintiff's requests to leave campus, even for work-related matters, requiring him to take paid leave to do so. (*Id.* ¶¶ 33–49, 52). Plaintiff describes the alleged disparate treatment as "death by a thousand cuts." This treatment allegedly caused Plaintiff to alter his working conditions in a time-consuming and disruptive way, requiring him to document every interaction and every situation that could be misconstrued by Hayes, in order to defend himself. (*Id.* ¶¶ 50–51). It also allegedly resulted in Plaintiff's being passed over for a promotion for which he was otherwise qualified. (*Id.* ¶ 53).

In or about June 2006, Plaintiff submitted an application for reclassification to Principal Management Analyst. (*Id.* ¶ 54). Because of Plaintiff's race, gender, and religion, his application was never even processed, despite his qualifications for the position and his diligence in monitoring the status of his application. (*Id.* ¶¶ 55–57).

Plaintiff sued Clark County, DJJS, Townsend, Carter, and Hayes in this Court for violations of federal and state anti-discrimination laws, invoking the Court's jurisdiction under 42 U.S.C. § 1983. (*See* Compl. at ¶ 2). The Amended Complaint ("AC") omitted DJJS as a defendant and identified the jurisdictional basis of the complaint as 42 U.S.C. § 2000e-2. (*See* Am. Compl. at ¶ 2). Either statute supports federal jurisdiction, and the Court therefore also has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. The AC lists four causes of action: (1) Violation of 42 U.S.C. § 2000e-2 (Clark County); (2) Hostile Workplace Environment (Clark County); (3) Violation of the Equal Protection Clause of the Fourteenth Amendment

1  pursuant to 42 U.S.C. § 1983 (Hayes, Carter, and Townsend); and (4) Violation of Nevada
2  Revised Statutes ("NRS") § 613.330 (All Defendants). Defendants moved for summary
3  judgment, and the Court denied the motion. Defendants have now moved for the Court to
4  reconsider.

## II. LEGAL STANDARDS

### A. Rule 59(e)

A motion to alter or amend a judgment must be made within twenty-eight (28) days of entry of judgment. Fed. R. Civ. P. 59(e). Here, order was entered on September 20, 2010, and the present motion was filed ten days later on September 30, 2010. Therefore the motion to reconsider is timely under Rule 59(e) and should be considered under that rule as opposed to Rule 60(b). *Am. Ironworks & Erectors, Inc. v. N. Am. Contr. Corp.*, 248 F.3d 892, 898–99 (9th Cir. 2001) ("[A] 'motion for reconsideration' is treated as a motion to alter or amend judgment under Federal Rule of Civil Procedure Rule 59(e) if it is filed within ten days of entry of judgment.").[1]

### B. Motions in Limine

A motion in limine is a procedural device to obtain an early and preliminary ruling on the admissibility of evidence. Black's Law Dictionary defines it as "[a] pretrial request that certain inadmissible evidence not be referred to or offered at trial. Typically, a party makes this motion when it believes that mere mention of the evidence during trial would be highly prejudicial and could not be remedied by an instruction to disregard." *Black's Law Dictionary* 1109 (9th ed. 2009). Although the Federal Rules of Evidence do not explicitly authorize a motion in limine, the Supreme Court has held that trial judges are authorized to rule on motions in limine pursuant to their authority to manage trials. *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984).

---

[1] On December 1, 2009, the time to file a Rule 59(e) motion was changed from ten to twenty-eight days. *Compare* Fed. R. Civ. P. 59(e) (2009), *with* Fed. R. Civ. P. 59(e) (2010).

1   A motion in limine is a request for the court's guidance concerning an evidentiary question. *See Wilson v. Williams*, 182 F.3d 562, 570 (7th Cir. 1999). Judges have broad discretion when ruling on motions in limine. *See Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). However, a motion in limine should not be used to resolve factual disputes or weigh evidence. *See C&E Servs., Inc., v. Ashland, Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008). To exclude evidence on a motion in limine "the evidence must be inadmissible on all potential grounds." *E.g., Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Hawthorne Partners v. AT&T Tech., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993). This is because although rulings on motions in limine may save "time, costs, effort and preparation, a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Wilkins v. Kmart Corp.*, 487 F. Supp. 2d 1216, 1219 (D. Kan. 2007).

In limine rulings are provisional. Such "rulings are not binding on the trial judge [who] may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000); *accord Luce*, 469 U.S. at 41 (noting that in limine rulings are always subject to change, especially if the evidence unfolds in an unanticipated manner). "Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted to trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded." *Ind. Ins. Co.*, 326 F. Supp. 2d at 846.

### III.   ANALYSIS

#### A.   Motion to Reconsider

Defendants list six factual and four legal points of contention with the summary judgment order ("the Order"). As a preliminary matter, many of Defendants' arguments in the present motion are based on the Court having "relied on" or "credited" certain evidence Plaintiff

produced in opposition to Defendants' motion for summary judgment, notably, his own affidavit. The Court notes that it has made no findings of fact, and that Plaintiff need not *prove* any facts at the summary judgment stage. He need only *produce* admissible evidence which if believed by the fact-finder at trial would support a judgment in his favor. Defendants' misunderstanding of the summary judgment standard is illustrated by the first two sentences of the conclusion paragraph of its present motion. (*See* Mot. 11:16–18, Sept. 30, 2010, ECF No. 79 ("The Court appears to have relied exclusively on Plaintiff's Amended Complaint, Affidavit and to some extent, his Response to the Motion for Summary Judgment. Plaintiff has no factual support for the allegations in these filings.")). Of course the Court relied on Plaintiff's affidavit. The allegations in a plaintiff's affidavit *are themselves* factual support, regardless of whether they merely mimic the allegations previously made in an unverified complaint. That is the difference between an affidavit and an unverified complaint. The former is evidence because it is sworn. The latter is not evidence because it is unsworn. Unless and until it sits as a fact-finder at trial, it is not for a court in its capacity as an arbiter of the law to discredit or weigh admissible evidence produced, but only to note whether such evidence has in fact been produced. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Whether a defendant or a court believes a plaintiff's affidavit is "self-serving"—which it necessarily will be unless a plaintiff sabotages his case via his own affidavit—is irrelevant to a summary judgment analysis. A plaintiff's own affidavit, if not inadmissible for some reason, is competent evidence that should be sufficient in-and-of-itself to meet the shifted burden of production at summary judgment.

1. **Factual Challenges**

First, Defendants argue that Hayes became a Principal Management Analyst in 2002, not in 2006, as alleged in the AC and recited by the Court in the Order. There appears to be a dispute over this fact, but even assuming Defendants are correct, Plaintiff complains not that Hayes was promoted to that position instead of him in 2006, but that his application for reclassification of

1 his own position was either rejected or not properly processed and that Hayes wrongly influenced
2 the decision.
3     Second, Defendants argue that there is no evidence Plaintiff was stripped of work duties
4 because of Hayes, noting that the Court "credited" in a footnote Plaintiff's allegation that the
5 County has a policy of transferring rather than terminating poor employees who threaten race-
6 discrimination suits. The Court neither credited nor discredited this allegation, but simply noted
7 it and stated that while such a policy might support a disparate-impact claim in some
8 circumstances, it did not support the kind of disparate-treatment claim Plaintiff has brought. In
9 any case, Plaintiff produced affidavit testimony that some of his supervisory work duties were
10 given to Hayes upon her transfer. (*See* Pulsipher Aff. ¶¶ 51, 54, Apr. 14, 2010, ECF No. 50).
11     Third, Defendants argue that Plaintiff's reclassification application was in fact processed,
12 but the Court recited Plaintiff's allegation in the factual background section of the Order that it
13 was not. Defendants argue that the "internal review" that concluded a reclassification was not
14 warranted constituted the processing of Plaintiff's application. Defendants cite the deposition of
15 Cherlyn Townsend, who testified "I don't recall whether the—it was ever advanced or not. I do
16 recall that the assessment by the human resources manager did not support reclassification."
17 (Townsend Dep. 41:23–25, Feb. 17, 2010, ECF No. 79-3). Defendants then note that Plaintiff
18 admitted at his deposition that he had received an email in 2006 indicating that the human
19 resources department had forwarded his reclassification request to the finance department. (*See*
20 Pulsipher Dep. 212–14, Nov. 23, 2009, ECF No. 79-1). This evidence does tend to show that the
21 request was processed to some extent and was not summarily dismissed. Yet Plaintiff maintains
22 his application was not fully processed. (*See id.* ¶ 78 ("I have never received a formal acceptance
23 or rejection of my Reclassification Request.")). This fact remains disputed.
24     Fourth, Defendants argue there is no evidence Hayes was permitted to opine on Plaintiff's
25 application after he filed his hostile work environment complaint against her, as Plaintiff alleges,

1 but only before he filed that complaint. Defendants note that Plaintiff filed his complaint with
2 the Office of Diversity in November 2006 and that the internal review of Plaintiff's
3 reclassification request occurred before October 2006. Plaintiff disputes the timing, but the
4 exhibit he argues supports his claim that Witt asked for Hayes's input in January of 2007 is not
5 attached to his response. Assuming Defendants are correct, Plaintiff's claim of improper
6 influence would still be supported, regardless of the timing of his complaint against Hayes. The
7 question is whether someone influenced the review of the reclassification request with improper
8 motivations, not whether any hostile work environment complaint had been previously filed
9 against that person. This timing is not dispositive of the discrimination claim.

10 Fifth, Defendants argue that discriminatory comments made after an alleged incident
11 cannot be used to show discriminatory motive as to the incident. Defendants therefore ask the
12 Court to reconsider the evidence of Hayes's alleged discriminatory motive while discounting
13 remarks she allegedly made to Elonda Potter in 2008 or 2009.

14 It is far from clear that after-the-fact remarks are necessarily irrelevant. For example, if a
15 supervisor comments in 2009 that he always gives white employees the benefit of the doubt in
16 misconduct investigations, but that he considers black employees to be guilty until proven
17 innocent, could it honestly be said that such a comment would be irrelevant to that supervisor's
18 past firing of a black employee for misconduct in 2006? The comment wouldn't be rock-solid
19 proof of discriminatory motive in 2006, but it would certainly be relevant under Rule 401
20 because it would tend to make it more probable that the supervisor had a discriminatory motive
21 in 2006 than if he had not made the comment, and evidence-weighing is for the jury. But even
22 assuming for the sake of argument that after-the-fact remarks are necessarily irrelevant, Hayes
23 also allegedly made discriminatory comments to Jerome Simon and Patrick Black, and
24 Defendants do not argue that these comments were made after the alleged discriminatory events.
25 Sixth, Defendants clarify that Hayes reported directly to Carter, not to Townsend, from

the time she was assigned to the PDU in 2006.

### 2. Legal Challenges

First, Defendants argue that the "cat's paw" theory of liability is inapplicable in this case. They argue that because Janet Witt was not a decision-maker with respect to Plaintiff's reclassification request, Plaintiff's wrongfully motivated influence on Witt, if any, is irrelevant. Defendants point to Witt's testimony that a "reclassification" is different than a "promotion." A reclassification is when an existing position is upgraded, resulting in the employee being either promoted or demoted in accordance with the new classification of the position he occupies. A promotion is when a person moves into a different position that is classified higher than the position he currently holds. (Witt Dep. 13:13:9–14:2, Dec. 11, 2009, ECF No. 79-4).[2] Witt testified that Townsend asked her do perform an "informal job audit" on Plaintiff in the summer of 2006 in response to his request for reclassification. (*Id.* 14:18–24). Witt stated that she made no determination as to reclassification, because Townsend had only told her to do an informal review. (*Id.* 16:16–17:3). Plaintiff's testimony, however, contradicts Witt's. Plaintiff testified that Witt and/or Townsend made a determination not to reclassify his position based on Hayes's alleged wrongful input. (*See* Pulsipher Aff. ¶¶ 57–58, Apr. 14, 2010, ECF No. 50). It is not for the Court to weigh the conflicting testimony at the summary judgment stage. Moreover, the failure to even make a formal reclassification determination is in fact an integral part of Plaintiff's theory of the case. This appears to be what he means when he says his application was

---

[2]The difference is probably irrelevant for the purposes of Title VII. The denial of an upward reclassification request could constitute an "adverse employment action" under the County's system. That term is broadly defined. *See Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). It includes, for example, "dissemination of an adverse job reference," even where that reference does not affect a hiring decision. *Id.* at 1241 (citing *Hashimoto v. Dalton*, 118 F.3d 671, 676 (9th Cir. 1997)). "Refusal to promote" and "toleration of harassment by other employees" also fits the definition. *Id.* (quoting *Wyatt v. City of Boston*, 35 F.3d 13, 15–16 (1st Cir. 1994)). An adverse recommendation in response to a reclassification request could therefore satisfy the definition of "adverse employment action."

not processed. Defendants cannot argue both that the application for reclassification was processed (because it was sent from the human resources department to the finance department), but then at the same time argue that they are off the hook for any alleged adverse determination because no "formal" determination was made, only an "informal review." Compliance with Title VII in this context would seem to require processing an application fully, meaning actually making a decision without improper intent, not pigeon-holing an application. In other words, pigeon-holing an application with discriminatory motive is just as wrongful as "formally" denying one with discriminatory motive.

There remains a key nuance in this case. If Hayes only wrongly influenced Witt, and it was not Witt, but Townsend, who made the decision to pigeon-hole Plaintiff's reclassification request by ordering Witt to conduct only an "informal job audit," and not to make a "formal" determination on the reclassification request, there may be no link between the wrongful motivation and the adverse employment action. The facts on this point are not entirely clear. Plaintiff appears to allege that Hayes also influenced Townsend, at least indirectly through Witt. (*See id.* ¶ 57 ("Cheryln Townsend and Janet Witt, the DJJS Manager responsible for personnel, requested that Sharon Hayes review and evaluate my job duties, qualifications and fitness for the Reclassification.")). There therefore remains a factual question on this point, and the claim is not appropriate for summary adjudication.

Second, Defendants argue that no employee who was similarly situated to Plaintiff in relevant respects was treated more favorably than he was. Less favorable treatment is one way in which a plaintiff may show discrimination. *See, e.g., Cornwell v. Elecrta C. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006). A showing of less favorable treatment creates a rebuttable presumption of discrimination. *Id.* The presumption, but not the claim itself, is defeated if a defendant can show a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* But a plaintiff need not show that he is entitled to a presumption of discrimination in order to

establish a prima facie discrimination claim. A plaintiff may also show discrimination through direct evidence that he was subject to an adverse employment action because of a discriminatory motive, regardless of whether others were more favorably treated. If comparative maltreatment were the only way to show a Title VII violation, an employee who was maltreated due to his or her race, gender, or religion would never have a Title VII claim in cases where the employee is in all material respects in a unique position within an organization, and it is clearly not the case that the *McDonnell Douglas* Court intended to bar such plaintiffs from bringing Title VII claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n.13 (1973) ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations."). Moreover, the "similarly-situated" language has been superimposed onto the *McDonnell Douglas* rule due to the factual situation that typically accompanies such claims; the case itself does not include this requirement. *See id.* at 802. The language of "similarly situated" appears nowhere in the case. *See generally id.* The Supreme Court has reiterated that the *McDonnell Douglas* fact pattern is not

> the only means of establishing a prima facie case of individual discrimination. . . . The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802 n.13). Plaintiff has provided direct evidence of discriminatory motive by way of testimony concerning Hayes's discriminatory comments. *See Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005) ("Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer."). He has also provided evidence that his reclassification application was either denied or not fully processed because of

1  Hayes's input. Summary judgment on this claim is therefore not appropriate.

2  Third, Defendants argue that Plaintiff was not a supervisor. Although listed as a legal issue, Defendants argue this as a factual issue. Defendants argue that Management Analyst IIs do not have supervisory qualifications because they do not perform supervisory tasks. But this was precisely Plaintiff's argument in applying to have his position reclassified: that his particular position in fact required supervisory tasks, and that it should therefore be reclassified upward from Management Analyst II to Principal Management Analyst. Defendants also argue that Plaintiff did not in fact have any supervisory duties in his position at the Academy. The Court finds that this is a question of fact. Plaintiff alleges, and Defendants do not appear to deny, that he was regularly in charge of cadets at the Academy as an instructor. On the other hand, Defendants argue, and Plaintiff does not appear to deny, that he never supervised permanent Academy personnel. The core disagreement appears to be over whether Plaintiff was a "supervisor" in his capacity as an instructor of students at the academy. A reasonable fact-finder could find that the supervision of students at an academy requires significant supervisory skills. For example, military personnel attending training courses away from their permanent stations are supervised in all aspects by local sergeants and officers who administer the training course the student is present to attend, even though the student is permanently assigned to a distant base. These student personnel have no daily supervision by their permanent supervisors while at the distant training location, and supervision is left to the instructors at the training institution. The present situation appears to be similar. That is, a typical cadet at the Academy likely has no direct supervision by his permanent supervisor, but only by Academy instructors who are immediately present. Just because Academy personnel presumably cannot make employment decisions in the same way that the cadets' permanent supervisors can does not mean that Academy instructors require no supervisory skills to perform their jobs. Because reasonable fact-finders could disagree on this point based on the evidence currently adduced, it is not suitable for

summary judgment.

Fourth, Defendants argue that Plaintiff has failed to show any improper motivation for Hayes's alleged poor treatment of Plaintiff, and that his hostile work environment claim therefore fails. Defendants argue that Plaintiff's evidence of Hayes's discriminatory comments falls outside of the eight-week period in the Fall of 2006 during which Plaintiff alleges Hayes harassed him with discriminatory motivation and that Plaintiff never complained of discriminatory treatment from April 2006 to October 2006 when he worked for Hayes.

Whether Plaintiff previously complained of the treatment he now alleges to have suffered is only relevant to Title VII's exhaustion requirements and Plaintiff's own credibility. The former issue is no longer in dispute, and the Court may not consider the latter issue at the summary judgment stage. Also, Hayes's comments are not necessarily irrelevant simply because they were made outside of the time period during which Plaintiff alleges harassment and disparate treatment. Before-the-fact and after-the-fact comments will often be the "smoking gun" of discriminatory treatment. Such comments are relevant so long as they are probative of the actions complained of. It will be the impossibly rare situation where a defendant makes a discriminatory comment contemporaneously with the discriminatory act such that the entire evidence necessary to support a Title VII verdict is encapsulated in a single snapshot. No one says, "I'm recommending denying your request because you are black, and I'm going to harass you and encourage your coworkers to ignore you for the same reason." Even unapologetic racists are cleverer than that. A fact-finder will often have to piece together conflicting and ambiguous evidence to determine whether an act was done with discriminatory intent. Furthermore, as noted *infra*, Hayes's comments to Elonda Potter were made during the period that Plaintiff alleges harassment. And, as Plaintiff notes in his response, the Clark County Office of Diversity itself found that "During this time period of March–July 2005 Sheron Tisdale-Hayes did make inappropriate race and religious based comments to Jerome Simon *when referring to Alan*

1 *Pulsipher*. . . . Such comments must be proscribed as left unchecked could create legal liability for the organization." (Office of Diversity Mem. to Cherlyn Townsend, Mar. 6, 2007, ECF No. 55-7 (emphasis added)).

Defendants argue that Hayes's discriminatory comments are "stray" as a mater of law. "Stray" comments are those that are made outside of the context of employment decisions. *See Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438 (9th Cir. 1990). For example, if a supervisor makes a racist comment to a colleague that has nothing to do with employment decisions, then the attitudes illustrated by the comment cannot be imputed to an adverse employment decision, but if a supervisor makes a comment in the context of an employment decision, the attitudes illustrated by the comment can be considered as motivating the decision. In other words, it is not enough for a plaintiff to show that the supervisor dislikes people of his or her background as a general matter. The comment(s) must indicate that the supervisor is apt to treat members of the plaintiff's background unfairly in employment decisions, or that the supervisor has treated or intends to treat the plaintiff unfairly in a particular circumstance. Although remarks specifically related to a plaintiff's own employment decision are the mostly clearly relevant kinds of remarks, the Ninth Circuit has also held that remarks related to general employment practices or attitudes can be relevant to show discrimination in particular instances even if not directed specifically to those instances, so long as the comments are made by the decision maker. *See Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1476–77 (9th Cir. 1985).

At least some of Hayes's comments in this case were made in the employment context. Elonda Potter testified at her deposition that Hayes had several times pointed to the back of her hand to indicate her skin color in a context that implied that African-Americans should stick together, and Hayes did this specifically in the context of the Hayes–Pulsipher conflict, i.e., Hayes had told Potter not to speak with Pulsipher and was upset with Potter that she had. (*See*

Potter Dep. 34–39, Dec. 17, 2009, ECF No. 53-2).[3]  Hayes also once accused Jerome Simon of "being loyal to the whites." (Simon Dep. 30:10–11, Dec. 15, 2009, ECF No. 53-1).  Simon testified that Hayes stated to him (at work) that whites and Mormons stick together, so blacks should also stick together. (*See id.* 32–33).  Although Simon did not believe Hayes was referring specifically to Plaintiff, but to other white, Mormon, male employees, these comments were made in the employment context because they had to do with cooperating with other employees at work and choosing sides in disputes at work, which is relevant to the hostile work environment claim. (*See id.* 32–36).  The comments Hayes made to Patrick Black, unlike those made to Potter and Simon, are more likely stray, because they simply indicate Hayes's dislike for white coworkers as a general matter in 2001 or 2002, without any indication that she intended to treat them differently than non-white coworkers or that she expected her subordinates to follow suit. (*See* Black Dep. 11:10–12:12, Feb. 23, 2010, ECF No. 53).  Again, the Court did not "credit" this evidence, as Defendants argue, and it need not do so.  It found only that admissible evidence had been produced that would be sufficient to support a finding of discriminatory motive if a fact-finder did credit it.

**B.  Motion in Limine**

Defendants make seven evidentiary requests.  First, they ask the Court to exclude any evidence that Clark County transferred or promoted poor performing employees who threatened race discrimination lawsuits, such as Hayes.  As Defendants note, the Court has ruled that Plaintiff has not brought a disparate-impact claim, and he has not named Clark County as a Defendant with respect to the § 1983 claim. (*See* Order 7:17–8:13, Sept. 20, 2010, ECF No. 78).  Defendant asks the Court to exclude such evidence because it is not relevant to any of Plaintiff's claims and is likely to confuse the jury. *See* Fed. R. Evid. 401–403.  The Court grants the motion

---

[3]Incidentally, this deposition testimony puts into dispute Defendants' claim that Hayes never made allegedly discriminatory comments to Potter during the relevant time frame.

in this regard but will not categorically exclude all evidence of Hayes's alleged poor performance if Plaintiff can show it is relevant to his other claims.

Second, Defendants ask the Court to exclude testimony by Patrick Black and Catherine Hale regarding alleged discriminatory comments by Hayes. Defendants argue these comments are too remote in time to be relevant. The comments are not irrelevant. A discriminatory comment made in 2001 is relevant to alleged discriminatory actions taken in 2006, because evidence of a past discriminatory attitude affects the probability that an action taken later was motivated by discriminatory intent, a fact which is of consequence to a discrimination claim. *See* Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Defendants may certainly argue to the jury that the lapse in time makes the evidence weak—Plaintiff must of course prove intent, and all other elements of his claims, by a preponderance of the evidence—but relevance under Rule 401 is an either–or concept, not a sliding scale. The Court asks only *whether* evidence is relevant. *See id.* ("*any* tendency" (emphasis added)). It is for the fact-finder to determine how persuasive a particular piece of evidence is. In order to avoid any possible error, the jury can be instructed that they cannot consider stray comments, and this can be defined for them. The Court denies the request to categorically exclude the comments.

Third, Defendants ask the Court to exclude evidence of Hayes's employment history before she arrived at DJJS as irrelevant to Plaintiff's claims. The Court cannot say at this point that any such evidence would be irrelevant for all purposes. At a minimum, there may be evidence relevant to impeachment.

Fourth, Defendants ask the Court to exclude evidence by Elonda Potter regarding alleged discriminatory comments by Hayes because Potter did not work with Hayes until after the alleged discriminatory treatment. Defendant argues that "[t]estimony from witnesses who were not in

1 the workplace during the applicable period cannot possib[ly] be probative of Plaintiff's hostile
2 work environment claim." (*See* Mot. Limine 7:11–13, Nov. 15, 2010, ECF No. 84). This is not
3 persuasive. What if Hayes had said to Potter, "I can't stand white, Mormon guys like Pulsipher.
4 I messed with him at work whenever I could!"? Of course, there is no evidence in the record
5 Hayes ever said anything like this, but it would be relevant to both a hostile work environment
6 claim and a discrimination claim if she had. There is evidence she made comments indicating
7 her motives and intent to treat persons of Plaintiffs' protected classes differently. Evidence of
8 intent does not become irrelevant simply because it is revealed after the action occurs. In fact, an
9 after-the-fact admission might be considered particularly powerful evidence by a fact-finder,
10 because a person who behaves this way has a strong motivation to hide her motivations after the
11 damage is done. The jury can decide, with appropriate instructions, whether Hayes's comments
12 to Potter support the claims. The Court denies this request.

13     Fifth, Defendants ask the Court to exclude evidence of unrelated discrimination suits
14 against Clark County. The Court excludes such evidence as irrelevant. *See* Fed. R. Civ. P.
15 401–402.

16     Sixth, Defendants ask the Court to exclude testimony that Hayes used the term "Mormon
17 Mafia." Defendants argue that Catehrine Hale's testimony on this point is vague. Defendants
18 can argue this to the jury if the testimony is adduced. If Hale takes the stand, they may cross
19 examine her. Defendants also argue that the comments are more prejudicial than probative. But
20 the comments are in fact only inflammatory precisely because of their probity. The evidence will
21 not be excluded. Again, the jury may be instructed on the stray-comments doctrine.

22     Seventh, Defendants ask the Court to exclude Jerome Simon's testimony about comments
23 Hayes made to Simon. Defendants argue that such comments do not support a harassment
24 theory, because they were not made in Plaintiff's presence. But such comments are relevant to
25 intent, which is an element of the discrimination claim. The Court denies this request.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion for Reconsideration (ECF No. 79) is DENIED.

IT IS FURTHER ORDERED that the Motion in Limine (ECF No. 84) is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

Dated this 27th day of December, 2010.

_____
ROBERT C. JONES
United States District Judge